**UNITED STATES of America,**
**Appellee,**

v.

**Louis A. MARCHISIO, John H. Seiter and W. Ward Whipple, Defendants-Appellants.**

**No. 170, Docket 28987.**

United States Court of Appeals
Second Circuit.

Argued Dec. 3, 1964.

Decided April 9, 1965.

Bernard W. Nussbaum, Asst. U. S. Atty., So. District of New York (Robert M. Morgenthau, U. S. Atty. for So. District of New York, Vincent L. Broderick and John S. Martin, Jr., Asst. U. S. Attys., on the brief), for appellees.

Joseph W. Burns, New York City (John P. Cuddahy and Austin, Burns, Appell & Smith, New York City, on the brief), for defendants-appellants.

Before FRIENDLY and SMITH, Circuit Judges, and BLUMENFELD, District Judge.*

### J. JOSEPH SMITH, Circuit Judge:

Louis A. Marchisio was convicted on trial before a jury in the United States District Court for the Southern District of New York, William B. Herlands, District Judge, of perjury and false statements in violation of 18 U.S.C. § 1621 and 18 U.S.C. § 1001 respectively and of conspiring to commit these acts in violation of 18 U.S.C. § 371. The appellants John H. Seiter and W. Ward Whipple were found guilty by the same jury of perjury and false statements and of conspiracy to commit perjury, all in violation of the above statutes. Marchisio received a sentence of one year and one day on each count with the sentences to run concurrently; imposition of sentence was suspended as to Seiter and Whipple, and they were placed on probation for two years concurrently on all counts. All three appeal. We find that the convictions for perjury, false statements and conspiracy were proper and that the trial court committed no error in the admission or exclusion of evidence, and we affirm the judgments.

The thirty-two count indictment filed by the Grand Jury on January 31, 1963 originally named six officers or employees of Washington Heights Federal Savings and Loan Association—Floyd Cramer, Frank Marsden, George O'Neill, Marchisio, Seiter and Whipple [1]—and George Martocci, a partner in the Colonial Mortgage Company, a mortgage brokerage firm that did a considerable amount of business with Washington Heights during the period in question. Cramer, the architect of the conspiracies and the one whose far-reaching ambitions caused the downfall of the others, died before trial. The indictment was severed as to Martocci, who served as the principal Government witness at the trial, and the remaining five were convicted. The appeals of Marsden and O'Neill have been dismissed on their own motions.

### I. OUTLINE OF THE EVIDENCE

This case occupied some four months of trial time, involving eight thousand pages of testimony and hundreds of exhibits. The Government drew an elaborate picture detailing a multitude of unethical, if not illegal, transactions and dealings in the course of Washington Heights' business, culminating in the perjurious and false statements. We summarize the factual background.

---

* Sitting by designation.

1. These officers and employees of Washington Heights served in the following capacities: Floyd Cramer was president and chief executive officer from 1951 to the time of the indictment; Louis A. Marchisio, during the years 1953, 1954 and 1955, was the general counsel and on January 1, 1961 became executive vice-president; Frank Marsden since 1951 was a senior vice-president; George O'Neill during the years 1951 through 1955 served as an employee in the mortgage department; John H. Seiter from 1951 on was a vice-president and during the years 1953–1954 and 1955 served also as a mortgage officer; and, W. Ward Whipple from 1951 on was a senior vice-president and was the mortgage officer during the years 1951 and 1952, a duty he again assumed in 1960.

Washington Heights, a financial institution engaged in the business of investing its depositors' savings principally in loans secured by mortgages on real estate, was founded by Cramer in 1941. It experienced immediate growth and came to be a leading institution in the greater New York City mortgage industry. In 1951, the two partners in Colonial, Martocci and James Houlihan, since deceased, discovered that one Fred Rellstab had an arrangement with Washington Heights whereby Rellstab acted as the exclusive mortgage broker for the bank in Westchester County. Recognizing the potential of an agency of that sort, Martocci and Houlihan approached Cramer and Whipple, president and vicepresident and mortgage officer of Washington Heights respectively, in the hope of obtaining a similar exclusive agency for Colonial in the Bronx. Whipple informed them that Rellstab's good fortune was largely in consideration for Rellstab's agreeing to pay the salary of a public relations expert hired to publicize Cramer (who already had manifested ambitions of one day becoming President of the United States) and suggested that the brokerage arrangement requested by Colonial might be possible if Martocci and Houlihan were willing to do the same. The two agreed to Whipple's proposition, and beginning in August 1951, Colonial paid the public relations man $750 per month, receiving in return a three year exclusive agency with Washington Heights entitling Colonial to a 1% commission for all mortgage loans extended by the bank in the Bronx. The payments by Colonial continued for an eighteen month period and totaled about $12,000.

As a result of its favored status, Colonial's income and profits multiplied, but Washington Heights', or rather Cramer's, continued beneficence naturally carried its price—Martocci and Houlihan were at Cramer and company's beck and call. From 1952 to 1954 Colonial was requested a number of times to perform various collection services for the bank and Cramer by accepting payment of monies actually owing to Washington Heights and by holding these sums in Colonial's name for Cramer's future use. For example, in September of 1952 Washington Heights purchased five mortgage loans from a broker named Saul Gaynes at prices which gave the bank discounts aggregating $27,628.79, but the bank never received the benefits of the discounts. Instead, Washington Heights made it appear that Gaynes received par value and instructed Gaynes to pay the entire discount sum to Houlihan of Colonial. Houlihan, asked personally by Cramer to act as conduit for this money, accepted payment from an intermediary source and pursuant to Cramer's instructions, a few weeks later, made some initial disbursements from this fund ($500 to a political campaign and $500 to the Student Volunteer Movement, a charity actively promoted by Cramer). Other collections made by Colonial were received in the form of 1% fees on mortgage loans granted by the bank to service veterans; for the 1% charge Colonial representatives attended closings at which mortgage loans to builders were being changed, or "recast," to mortgage loans to veterans who had purchased homes from the builders.[2] During this two year period, Martocci maintained a yellow tally sheet of the

---

2. In the fall of 1952, Martocci suggested to Marsden, Whipple and Marchisio that the bank extend mortgage loans to service veterans so that these veterans could purchase homes from builders who were clients of Colonial. Whipple and Marchisio were reluctant to accept that business, primarily because of the low rate of interest permitted, and when Marsden suggested that they charge the purchaser or the builder an extra 1%, Marchisio replied that an extra charge of that sort would probably be contrary to the Veterans Administration regulations. Nevertheless, it was finally decided in December that the extra 1% would be charged, but to circumvent the possible illegality, the fee instead was to be collected by Colonial and held for Washington Heights.

During this period there were yet other collections which Colonial made in behalf of Washington Heights. One was the "Boano" loan, a loan placed by Colo-

funds thus retained and of disbursements made at the direction of Cramer, Seiter, Marsden and O'Neill.

This arrangement provided the basis for the very large transactions of 1954 and 1955. In March and April 1954, Marchisio requested Martocci to purchase two delinquent mortgage loans from Washington Heights on the understanding that Colonial would be reimbursed for any loss suffered, and in July a similar request was made with respect to a construction loan on a project that was about to be foreclosed (the "Saxon Heights" project).[3] Cramer was apparently concerned, in this case, with avoiding showing a loss on loans which might indicate to the supervisory personnel of the Federal Home Loan Bank Board that the bank had exercised poor judgment in extending the particular loans.

Colonial, instead of Washington Heights, sustained losses on these mortgages of approximately $113,000. As a means of repayment, Cramer and Marsden originated a scheme whereby Washington Heights would actually receive as an origination fee with respect to certain mortgage loans an amount which was less than that which Colonial offered to the bank and which Colonial and the

Washington Heights' mortgage officer decided was due the bank. For example, if a loan was offered at a bonus of 6%, Washington Heights would accept it at a 4% bonus and allow Colonial to retain the other 2% (2 "points"). Over the two year period during which this arrangement functioned, Colonial collected in excess of $230,000, far more than was necessary to reimburse it for its losses; the remaining balance was used, at Washington Heights' direction, to help finance Cramer's unsuccessful congressional campaign (almost $80,000) and to purchase additional delinquent mortgages from Washington Heights. In late 1955, the running account, recorded regularly on yellow sheets by both O'Neill and Martocci, was about in balance, and in this posture Marsden terminated the point retention agreement.

Colonial's designation as nominal holder of funds belonging to Washington Heights posed several accounting problems, especially that of showing on its books that this money was merely being retained. From 1952 to 1954, the various sums received were recorded as credits in an account labeled as the "Recast Loan Account," and all disbursements on behalf of and at the direction of Wash-

nial with the bank for which the bank was supposed to receive a 3½% origination fee but at Whipple's direction received only 3%; Martocci was instructed to retain the other ½ of 1%. Another was a 1% fee ($686) on a building loan which Colonial had nothing to do with. Substantial sums were also collected through the retention of portions of origination fees on speculator-operator loans granted by Washington Heights.

3. The Saxon Heights project figured prominently in the Government's case; it represented the largest single loss which Colonial sustained at Washington Heights' behest and involved many of the defendants.

In July, 1954 the initial discussions began between Houlihan and Cramer and between Marsden, Marchisio and Martocci with respect to Colonial's purchase of Saxon Heights on which construction already had halted and which was about to be foreclosed at a substantial loss to the bank. Houlihan and Martocci agreed

to the purchase provided they would be repaid immediately; Marchisio, Marsden and Cramer assured them of quick repayment. A few weeks later Colonial paid $42,000 to Marsden who requested the money in order to reduce the mortgage from $130,000 to $88,000.

In August, Jacob Nass, Colonial's new attorney, at Marchisio's request formed a separate corporation named Jacbiljoe, later changed to April Estates, for the purpose of having this corporation acquire delinquent mortgages from Washington Heights and thereby avoid Colonial's direct involvement in the transactions. It was Jacbiljoe, represented by Nass, which took title to Saxon Heights; at the closing, Nass supplied the builders with sufficient funds to pay their debts and thereby prevent the foreclosure sale. In the ensuing months, Jacbiljoe sold the vacant lot in the project, completed the construction on the other two lots and sold them, paid off the mortgage held by Washington Heights, and altogether sustained a loss of approximately $102,000.

ington Heights were recorded therein. In late 1954, a new account entitled "Accommodation Account" appeared for the first time; all amounts received thereafter were either relegated to this new account or to the "Recast Loan Account," and, when in 1955 the repayment arrangement was discontinued, both of these accounts ceased to be active.

In 1956, an Internal Revenue Agent was assigned to examine Colonial's books and records, and the presence of the two accounts, neither of which was reported as income, understandably aroused his curiosity. An internal revenue investigation was commenced immediately to determine the source and use of these funds—thus began the series of investigations, inquiries and eventually the Grand Jury hearings which culminated in the prosecution of the defendants for perjury, false statements and conspiracy.

Shortly after the internal revenue investigation started, Martocci reminded Marsden that Washington Heights had in its files letters from Colonial which showed the origination fees which Colonial offered Washington Heights when it applied for mortgage loans. In the subsequent months, several discussions concerning these letters transpired between Marchisio, O'Neill, Marsden, Seiter and John Hannigan, the bank's closing attorney and Marchisio's subordinate, and it was decided that the letters would be removed.

Prior to the Internal Revenue hearings, Marsden, O'Neill, Cramer, Marchisio, George and Edward Martocci, and Nathan Goodman, the Martoccis' attorney, met on various occasions in smaller groups (they never met all together) to discuss what answers would be given, and it was agreed upon that the existence of any arrangement with Colonial would be denied. On April 10, 1957, Cramer testified that he had no knowledge of the advances by Colonial to Washington Heights and the subsequent reimbursements; Marsden's testimony two days later corroborated Cramer's. O'Neill stated that he had been given as much as $75,000 by Martocci and that he had applied this money to Cramer's campaign.[4] Marchisio attended the April 12th session at which Marsden and O'Neill testified and made notes of their testimony. Martocci appeared before the Service on June 2, 1958, over a year after the initial hearings, and with the aid of Marchisio's summaries, was able to substantiate the prior testimony, stating that he had given O'Neill large sums for Cramer's campaign, that Colonial had made similar contributions, and that Colonial had purchased delinquent mortgages from Washington Heights solely for promotional purposes.

A Grand Jury was convened in October 1960 to determine whether those connected with Colonial had violated the laws against income tax evasion and conspiracy. Following several days of testimony before the Grand Jury, including that of Cramer, Marsden, O'Neill and Seiter to the effect that there had been no arrangement between Colonial and Washington Heights, Martocci, his brother Edward, and his accountant were indicted for income tax evasion. Martocci, short of cash, then requested money from Washington Heights with which to conduct his defense; through an intermediary, one James Bell, who had served as the bank's architect for 15 years, Martocci received $95,000.[5] In the following months, Cramer's attitude to-

---

4. Martocci had actually given the money for the Cramer campaign to Marsden, but O'Neill told Martocci that he would rather have Martocci say that he had given the money to O'Neill in order to protect Marsden, who was a senior bank official. Marsden, when he was informed by Martocci of this plan, thought that this was a very considerate gesture on O'Neill's part.

5. Bell, at Marsden's request, sometime shortly after the indictment, purchased from Cheyenne Realty Company, which was owned by the Colonial partners, a participating interest in a mortgage on a property known as Gedney Farms (the mortgage had previously been purchased from Washington Heights). At a meeting held in December 1960, attended by Marchisio, Cramer, the Martoccis and

ward Colonial began to cool, and Martocci decided to reassess his predicament and apparently realized that Cramer had offered him up as the sacrificial lamb. Martocci hired a new law firm to represent him in the criminal tax case, and soon thereafter new discussions were held with the Washington Heights' principals. At the final meeting, attended by Martocci, his attorneys, his brother Edward, O'Neill and Marsden, Martocci's attorneys advanced their opinion that the Martoccis had not evaded any taxes and that there had been an arrangement to reimburse Colonial, and warned Marsden and O'Neill that they were going to do everything to keep the Martoccis from going to jail. Following this meeting, Whipple told Martocci that Washington Heights would no longer do business with Colonial; a few days later Martoccis' attorneys presented information to the United States Attorney's Office relating to the Washington Heights-Colonial agreements and subsequent events.

A Grand Jury was summoned in January 1961 to determine if any of the principals had committed perjury or were involved in any illegal conspiracy to violate the perjury laws. Hannigan claimed the protection of the Fifth Amendment in response to certain questions. Marsden, Marchisio, O'Neill and Whipple all appeared before the Grand Jury and denied knowledge of any arrangement or of the removal of the origination fee letters from the bank's files, but they admitted that Colonial had from time to time been accorded favored treatment and that Washington Heights had sometimes received an origination fee which was less than normally offered. The Grand Jury took no action at that time.

Following these initial inquiries, the Federal Home Loan Bank Board, the governmental agency in charge of supervising federal savings and loan associations, was apprised of what had transpired and submitted interrogatory letters to Cramer and other Washington Heights officers requiring statements from each admitting or denying the allegations that had been made against them, describing the extent of the Washington Heights-Colonial relationship and relating any other pertinent information. Cramer, Marchisio, Marsden, Seiter and Whipple all denied the charges and stated that no agreement existed, that Colonial was never reimbursed for political and charitable contributions, and that they had no knowledge of Colonial's having ever sustained losses on delinquent mortgages at Washington Heights' behest.

In late 1961, the Federal Bureau of Investigation investigated a series of transactions, displaying a marked similarity to the Washington Heights-Colonial arrangement, which had taken place between Washington Heights and one Earl Snyder, a mortgage broker, whereby Snyder was reimbursed for losses incurred in his purchase of delinquent mortgages from the bank.[6] The agent interviewed Seiter, Whipple, Marsden, Mar-

---

Houlihan, the Martoccis expressed their need for defense funds and it was Cramer who suggested that Bell be contacted. Marsden, following the meeting, spoke to Bell and told him that it would help the bank's relationship with Cheyenne Realty, if he, Bell, bought the rest of the Gedney mortgages. Bell subsequently sent Marsden a check for $75,000 to purchase for Bell a larger interest in Gedney Farms; Bell received $83,000 from the eventual liquidation of the property.

6. Earl Snyder testified at trial that a meeting was held at the offices of Washington Heights in May or June 1960 at-

tended by Marsden, Whipple, Cramer, Denton Lyon, a vice-president of the bank, and himself. An arrangement was worked out whereby Snyder would purchase certain mortgages at par value from Washington Heights (these mortgages otherwise would have been sold at discount prices to other institutions and accordingly the bank would have shown a loss on them) and any losses which Snyder might sustain on the subsequent sales would be made up from brokerage commissions on mortgages that he brought into the bank. On mortgages on which Snyder got the bank a fee of 10% or 5%, Snyder would receive finder's fees of 2% and 1% respectively. Snyder's

chisio and Cramer, each of whom denied any connection between the bank and Snyder, but did not interview Denton Lyon, a vice-president of Washington Heights, who was later to testify at the trial that there had in fact been an arrangement.

In October 1962, a Grand Jury was convened to investigate new charges of perjury, false statements and conspiracy. Marsden and O'Neill made a complete reversal, after retaining new attorneys, and admitted what had actually happened, describing the full extent of the Washington Heights-Colonial arrangements; Seiter acknowledged and related certain aspects of Colonial's transactions with the bank, but Marchisio, Whipple and Cramer continued to adhere to much of their previous testimony. On January 31, 1963, the Grand Jury met, voted and filed the indictment against the defendants.

## II. THE INDICTMENT

### A. *Meaning of Words Used*

■ There is no merit to appellants' argument that the indictment, by utilizing such words as "arrangement," "agreement," "assurances" and "reimbursement" to describe the allegedly perjurious statements, should have been dismissed as a matter of law because, appellants claim, such terms are not the kind of clear and unambiguous words and phrases which may be used as a basis for charges of perjury or false statements.[7] While it is true that these terms have been variously defined in dictionaries and judicial opinions, in the context of this case they had definite and unambiguous meanings—the jury was apprised of their significance through the

evidence introduced and appellants unquestionably were aware that reference was being made to the 1951–1955 association of Washington Heights and Colonial. Considering appellants' educational, intellectual and environmental backgrounds, they can hardly argue successfully that they were misled by these words. See United States v. Rose, 215 F.2d 617, 623 n. 6 (3 Cir. 1954).

Appellants' reliance on United States v. Lattimore, 127 F.Supp. 405 (D.D.C.), aff'd, 98 U.S.App.D.C. 77, 232 F.2d 334 (1955), is misplaced, for several reasons. In the first place, the perjury charges there arose from the defendant Owen Lattimore's statement that he was not a "follower of the Communist line," as that phrase was defined by the Government. Lattimore offered a different definition, and it was clear that these vague words were subject to varying interpretations. "[W]hen the charge in an indictment is in the area of the First Amendment," said the district court, "and when such indictment is challenged as being vague and indefinite, the Court will uphold it only after subjecting its legal sufficiency to exacting scrutiny." 127 F.Supp. at 407. Since here we are not dealing with words and ideas that might possibly be included within the constitutional guarantees of free thought, belief and expression, we need not examine the indictment so closely. Secondly, the Lattimore court was influenced by a factor which is not present in this case—the court found that there was no dictionary definition for the phrase as a whole, "no universally accepted definition." While "arrangement," "agreement" and the other words used connote different meanings

---

losses and expenses totaled about $11,000 for which he was later reimbursed in the form of fees on twenty-two mortgage loans he placed with the bank.

7. The questions which were asked of the appellants and upon which the perjury charges in the indictment were based often were phrased in such language as, "You never heard of any *arrangement* whereby Colonial was submitting mortgage applications to the bank at a cer-

tain fee and paying the bank less?" Many times the use of these terms was avoided altogether by such straightforward questions as, "Did you ever hear of any instance, overhear any discussions where it was discussed that Colonial was submitting mortgage applications to the bank at a certain fee and paying the bank less?" Both types of questions, the answers to which were invariably in the negative, appeared in the various counts of the indictment.

in different situations, they are precisely defined in dictionaries, are terms of common usage, and, under the circumstances, were subject to a reasonable and definite interpretation by the jury. "In a prosecution for perjury or false representation, absent fundamental ambiguity of the kind found in Lattimore, the question of what a defendant meant when he made his representation will normally be for the jury." United States v. Diogo, 320 F.2d 898, 907 (2 Cir. 1963). See also Seymour v. United States, 77 F.2d 577, 99 A.L.R. 880 (8 Cir. 1935) ("encouraging" held not to be fundamentally ambiguous).

### B. *Variance*

■ One minor argument raised by the appellants is that Counts 7 and 16 of the indictment, both perjury counts, should have been dismissed because there were material variances between the proof and the facts stated, in that the "truth" paragraphs were not related to the alleged false testimony. Even if there were such a variance, which there was not, it would be immaterial since the rule followed by this circuit is that an indictment for perjury is sufficient if it alleges the falsity of the defendant's oath without alleging what the truth was. United States v. Hiss, 185 F.2d 822 (2 Cir. 1950), cert. den. 340 U.S. 948, 71 S.Ct. 532, 95 L.Ed. 683 (1951); United States v. Remington, 191 F.2d 246 (2 Cir. 1951), cert. den. 343 U.S. 907, 72 S.Ct. 580, 96 L.Ed. 1325 (1952); Sharron v. United States, 11 F.2d 689 (2 Cir. 1926). Cf. United States v. Lattimore, 94 U.S.App.D.C. 268, 215 F.2d 847, 861 n. 7 (1954). Thus, the "truth" paragraphs were merely surplusage. See United States v. Hiss, supra.

### III. SUFFICIENCY OF THE EVIDENCE

■ The bulk of appellants' brief is devoted to the raising of numerous questions with respect to the sufficiency of the evidence. The jury, in reaching verdicts of guilty on both the substantive and conspiracy counts, were required to choose between competing inferences of fact—this was within their exclusive province. United States v. Dardi, 330 F.2d 316, 325 (2 Cir. 1964). "[O]nce the trier of fact has found for the government, the evidence must be viewed most favorably to it, which includes * * * the indulgence in all permissible inferences in its favor." United States v. Brown, 236 F.2d 403, 405 (2 Cir. 1956). See also, United States v. Woodner, 317 F.2d 649, 651 (2 Cir. 1963); United States v. Robertson, 298 F.2d 739 (2 Cir. 1962); United States v. Astore, 288 F.2d 26, 29 (2 Cir. 1961); United States v. Tutino, 269 F.2d 488, 490 (2 Cir. 1959).

The evidence was sufficient to prove appellants' guilt beyond a reasonable doubt on each of the perjury and false statements counts, as well as on the conspiracy counts.

### A. *The 1951–1955 Washington Heights-Colonial Arrangement*

■ Appellants contend that the weight of the evidence refutes the allegation that there was an arrangement or agreement to reimburse Colonial for losses sustained on the purchase of delinquent mortgages. The weight of evidence in fact clearly demonstrates that such an arrangement did exist. Martocci testified that, in August 1951, Colonial obtained an exclusive brokerage agency for the Bronx from Washington Heights, and Marsden corroborated that fact on cross-examination. Donoghue, the public relations expert, testified that he received money from Houlihan as payment for doing public relations work for Cramer, and Gaynes stated that the $27,628.-79 was money owed to Washington Heights but which he transferred to Houlihan through an intermediary bank. Martocci further testified that Colonial had received 1% commissions on "recast" veterans loans by merely attending the closings and had retained part of the origination fees owed to Washington Heights. In support of this testimony, the Government offered into evidence typewritten lists of 1% fees which Martocci sent to the bank, contemporaneous handwritten records of the amounts that Colonial was collecting or retaining, and

Colonial mortgage cards which showed the actual origination fees due Washington Heights. Other Martocci testimony, as well as Marsden's and O'Neill's, described the disbursements which Colonial made at the bank's direction, the purchase by Colonial of delinquent mortgages held by Washington Heights, including that of the Saxon Heights project, the yellow balance sheets maintained by O'Neill and Martocci (Martocci's copy was introduced into evidence and Hannigan's testimony corroborated the existence and purpose of the sheets), advances made by Colonial to finance Cramer's campaign, and the reconciliation session attended by Marsden, O'Neill and Martocci which resulted in the termination of the retained point arrangement. In addition, the Colonial books, showing the "Recast Loan Account" and "Accommodation Account," were introduced as evidence of the agreement. Altogether the evidence, both circumstantial and direct, provided a sufficient basis for proving that Colonial, during this period, had expended monies at the direction of Washington Heights' officers and had been reimbursed out of funds belonging to Washington Heights which had been diverted to Colonial—the question of Martocci's credibility was properly an issue for the triers of fact, and, in any event, there was abundant independent evidence.

B. *The Perjury and False Statement Counts*

■ *Marchisio.* Count 5 of the indictment charged Marchisio with falsely stating to a Grand Jury on February 14, 1961 that he did not know of any arrangement or agreement whereby Colonial was purchasing delinquent mortgage loans from Washington Heights, and Count 6 alleged that Marchisio perjured himself when he stated before a Grand Jury on October 29, 1962 that he had no knowledge of Colonial's having retained a part of the origination fees offered to Washington Heights or of the fact that Washington Heights officers were keeping a list of the amounts so retained. In Count 29, Marchisio was charged with making false statements to the Federal Home Loan Bank Board in answer to the Board's questionnaire, by responding that he did not know whether Colonial had suffered any losses on delinquent mortgages purchased from Washington Heights and that at no time during the years in question had Colonial incurred losses or made charitable or political contributions for which Colonial was eventually reimbursed.

The evidence was sufficient for the jury to find the appellant Marchisio guilty on each of the substantive counts of perjury and false statements, and we reject appellant's argument that Count 5 should have been dismissed because of the use therein of the words "agreement" and "arrangement" for the reasons already stated. In addition to Martocci's testimony which clearly implicated Marchisio in the Washington Heights-Colonial arrangement, there was testimony of Jacob Nass, Martocci's lawyer and Hannigan, detailing Marchisio's participation in Saxon Heights and other mortgage transactions.

■ *Seiter.* Similarly, there was sufficient evidence to establish Seiter's guilt. Seiter was charged in Count 9 with falsely stating to a Grand Jury on October 11, 1960 that he was not aware of any arrangement whereby something less than the offering bonus price of the mortgage was transmitted to the bank and in Count 31 with making the same false statements to the Federal Home Loan Bank Board as Marchisio.

Appellant Seiter argues that the phrase "offering bonus price" has no meaning and that he cannot be charged with a false answer to a meaningless question. That might be a valid issue if we were dealing with someone who was unfamiliar with the mortgage brokerage business, but the defendant served as mortgage officer of Washington Heights from early 1953 through 1955 and later admitted before the Grand Jury that he knew of the fee differential. Moreover, Seiter's Grand Jury testimony on October 11, 1960 indicates that the Washington

Heights-Colonial origination fee had been inquired about in a prior question the same day; thus, "*offering bonus price*" clearly referred to origination fees and Seiter understood it as such. Also, the testimony of Martocci, Marsden, Hannigan and others clearly implicated him in the Washington Heights-Colonial arrangement. Marsden, for example, revealed on cross-examination that Seiter cut back on Colonial loan charges and put through the loan at a lower cost than it was offered and that Seiter together with O'Neill kept a list of yellow sheets on which was recorded the balance of reimbursements to Colonial.

■ *Whipple.* Count 7 charged Whipple with falsely stating before a Grand Jury on November 14, 1962 that he never knew of an arrangement whereby the amounts of the mortgage loan origination fees which the bank was receiving from Colonial were regularly less than the amounts Colonial was offering. In Counts 12 and 16 respectively, it was alleged that Whipple perjured himself before a Grand Jury on February 15, 1961 by stating that he did not remember whether in 1951 James Houlihan (Colonial) was given an exclusive agency by Washington Heights to secure all mortgage loans in the Bronx and that he did not know that Colonial had purchased Washington Heights' interest in the Saxon Heights project; Count 14 charged him with falsely denying to a Grand Jury on November 14, 1962 that he knew of a refunding agreement under which Colonial picked up 1% commissions on "recast" veterans loans. Finally, in Count 32 Whipple was charged with wilfully misstating to the Federal Home Loan Bank Board that he did not know whether Colonial had suffered any losses on delinquent mortgages it had purchased from Washington Heights.

The evidence was sufficient to convict Whipple on all these counts. Aside from Martocci's testimony implicating Whipple in the general scheme, other evidence disclosed that Whipple shared an office at Washington Heights with his assistant O'Neill (an admitted participant in the Washington Heights-Colonial arrangement) during the time that he served as mortgage officer, from 1951 to 1953, and that he transmitted to Colonial funds which represented commissions on veterans building loans and from which Colonial later withdrew 1% fees. Moreover, Whipple's own admissions before the Grand Jury in November 1962 indicated that he had extensive knowledge of the exclusive agency granted Houlihan, and Marchisio on cross-examination, testified that when he asked Whipple in late 1962 to sign a statement denying the existence of an agreement whereby Washington Heights would reimburse Colonial for political and charitable contributions, Whipple suggested that an exception be included with respect to Colonial's exclusive agreement with the bank.

■ *Two-Witness Rule.* Appellants raise the argument that the Government's case was insufficient under the "two-witness rule" because the Government did not call a second available witness, Edward Martocci, the brother of George Martocci, and because it failed to corroborate George Martocci's testimony with that of a second witness or with independent evidence. The invocation of this rule in a perjury prosecution is, of course, proper, but where, as here, there was ample independent testimony and evidence introduced, the test that the verdict of guilty must be solidly founded has been satisfied. See United States v. Nicholson, 327 F.2d 491 (2 Cir. 1964).

■ The rule is traditionally stated as requiring in a perjury prosecution that the falsity of a defendant's testimony be proved by the testimony of two witnesses, or one witness corroborated by independent evidence. See, e. g., Weiler v. United States, 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495 (1944); United States v. Nicholson, supra; United States v. Bufalino, 285 F.2d 408, 418 (2 Cir. 1960); United States v. Collins, 272 F.2d 650 (2 Cir. 1959), cert. den. 362 U.S. 911, 80 S.Ct. 681, 4 L.Ed.2d 619 (1960); United States v. Lester, 248 F.2d 329, 331 (2 Cir. 1957); United States v. Reming-

ton, 191 F.2d 246, 249 (2 Cir. 1951), cert. den. 343 U.S. 907, 72 S.Ct. 580, 96 L.Ed. 1325, 88 A.L.R.2d 847 (1952). Historically, it is founded on the notion that a conviction for perjury ought not to rest entirely upon "an oath against an oath" —that witnesses who are compelled to testify will testify more freely if they know that they will not be subject to prosecution for perjury simply because an equally honest witness may well have a different recollection of the same events. Weiler v. United States, supra, 323 U.S. at 609, 65 S.Ct. 548. The rule is inapplicable to a false statements prosecution under 18 U.S.C. § 1001. United States v. McCue, 301 F.2d 452, 456 (2 Cir.), cert. den. 370 U.S. 939, 82 S.Ct. 1586, 8 L.Ed.2d 808 (1962).

All that is required under the rule, as it is construed by this circuit, is that the evidence independent of the principal witness' testimony be sufficient to corroborate that testimony. As to what kind of evidence constitutes independent evidence, we have held that extrajudicial admissions, United States v. Goldberg, 290 F.2d 729, 734 (2 Cir.), cert. den. 368 U.S. 899, 82 S.Ct. 176, 7 L.Ed.2d 94 (1961), and circumstantial evidence, United States v. Collins, supra, have corroborative value. Here we have, among other things, extra-judicial admissions by some of the defendants, the revealing testimony of several of the defendants on cross-examination, the testimony of nondefendants, records kept in the ordinary course of business, and a considerable amount of circumstantial evidence—the requirements of the rule have plainly been satisfied.[8]

*Materiality.* Appellants contend that their answers before the grand juries were not material to the subject under investigation, i. e., the income tax lia-

bility of the Martoccis, and that the Government did not prove the materiality of the statements made by them to the Federal Home Loan Bank Board.

It is fundamental to a prosecution for perjury that the statements alleged to be perjurious must be material in order to sustain a perjury conviction. The issue of materiality is one of law to be determined by the court, not one of fact for the jury. United States v. Alu, 246 F.2d 29, 32 (2 Cir. 1957). See also Carroll v. United States, 16 F.2d 951, 954 (2 Cir.), cert. den. 273 U.S. 763, 47 S.Ct. 477, 71 L.Ed. 880 (1927); United States v. Siegel, 263 F.2d 530, 533 (2 Cir.), cert. den. 359 U.S. 1012, 79 S.Ct. 1147, 3 L.Ed.2d 1035 (1959). Cf., United States v. Zborowski, 271 F.2d 661, 664 (2 Cir. 1959). In determining whether a particular statement is material, this court has said that the test "is whether the false testimony has a natural effect or tendency to influence, impede or dissuade the grand jury from pursuing its investigation * * *." Carroll v. United States, supra, 16 F.2d at 953. See United States v. Moran, 194 F.2d 623, 626 (2 Cir.), cert. den. 343 U.S. 965, 72 S.Ct. 1058, 96 L.Ed. 1362 (1952). Here the questions asked of appellants were aimed at discovering whether the funds recorded on Colonial's books under the two accounts ("Recast Loan Account" and "Accommodation Account") belonged to Colonial or to Washington Heights— whether in the instances set forth funds were expended by Colonial at the direction of Washington Heights for which reimbursement was later made by the bank. Certainly the answers provided by appellants had the effect of impeding the Grand Jury in pursuing that avenue of inquiry, and there is no doubt that the questions were pertinent to the Grand Jury investigations.

---

**8.** Appellants were not entitled to have an inference drawn in their favor because the Government did not call Edward Martocci as a witness. Edward's whereabouts were known by both sides and his counsel stated on the record that Edward would not claim any privilege if subpoenaed by any of the parties. See United States v. La Rocca, 224 F.2d 859, 861 (2 Cir.1955); Shurman v. United States, 233 F.2d 272, 275 (5 Cir.1956); Beale v. United States, 263 F.2d 215, 216 (5 Cir. 1959); United States v. Owens, 271 F.2d 425, 426 (2 Cir. 1959); Luttrell v. United States, 320 F.2d 462, 465 (5 Cir. 1963).

 Materiality, however, is not one of the essential elements of proof in a prosecution for false statements under § 1001, with the exception of the first clause of the statute which is not involved here. In United States v. Silver, 235 F.2d 375, 377 (2 Cir.), cert. den. 352 U.S. 880, 77 S.Ct. 102, 1 L.Ed.2d 80 (1956), we expressly rejected the position taken by several other circuits that in every case proof of materiality is a requisite to a § 1001 conviction,[9] and we subsequently have adhered to that viewpoint. United States v. McCue, supra. Cf. United States v. Sorkin, 275 F.2d 330, 331 (2 Cir. 1960). Thus, the elements of the § 1001 offense are simply four: (1) a statement; (2) falsity; (3) that the false statement be made "knowingly and wilfully"; and (4) that the false statement be made in a "matter within the jurisdiction of any department or agency of the United States."[10] United States v. McCue, supra, 301 F.2d at 454.

## C. *The Conspiracy Counts*

The court imposed sentences concurrently on all counts, and since we have found the convictions to be sustainable on the substantive counts, we would normally not reach the questions raised by appellants concerning their conspiracy convictions. However, the conspiracy issue occupied an important and integral part of the case and for this reason warrants some discussion, especially in view of our decision in United States v. Agueci, 310 F.2d 817, 99 A.L.R.2d 478 (2 Cir. 1962), cert. den. 372 U.S. 959, 83 S.Ct. 1016, 10 L.Ed.2d 12 (1963).

This court recognized in Agueci that in a mass conspiracy trial, where a number of defendants are charged with substantive offenses as well as with complicity in the conspiracy, the danger exists that the jury will consider evidence relating to other defendants and to other transactions in which the particular defendant was not involved in determining the defendant's participation in the conspiracy or defendant's guilt on the substantive counts. To avoid possible prejudice, this court strongly recommended that the trial court make the jury constantly aware of the fact that there are separate individuals on trial and that each must be judged solely on the evidence properly admissible against him. "It is the function of the judge * * * to marshal the evidence that they [the jury] have seen and heard presented such that justice may be meted out to the individual rather than to the group." 310 F.2d at 829. Judge Herlands fully appreciated our admonitions. During the course of the trial and in his charge, he instructed the jury that there were separate defendants on trial and that the evidence proffered must be segregated and related to the appropriate defendant, and he assisted the jury in marshalling the evidence, by directing their attention to the evidence of each defendant's own actions and conversations subsequent to 1955 when discussing the proof against that defendant on the conspiracy counts.

 *Proof of Appellants' Membership in the Conspiracies.* The conspiracy counts charged generally that

9. Those cases holding that materiality is an essential element to any prosecution under Section 1001 are: Gonzales v. United States, 286 F.2d 118 (10 Cir. 1960); Rolland v. United States, 200 F. 2d 678 (5 Cir.), cert. den. 345 U.S. 964, 73 S.Ct. 950, 97 L.Ed. 1383 (1953); Freidus v. United States, 96 U.S.App. D.C. 133, 223 F.2d 598 (1955); Brandow v. United States, 268 F.2d 559, 565 (9 Cir. 1959); Paritem Singh Poonian v. United States, 294 F.2d 74, 75 (9 Cir. 1961); United States v. Zambito, 315 F. 2d 266, 268–269 (4 Cir.), cert. den. 373 U.S. 924, 83 S.Ct. 1524, 10 L.Ed.2d 423 (1963).

10. Appellants' argument that the Federal Home Loan Bank Board's investigation did not concern a matter within the Board's jurisdiction is entirely without merit. The Board has the authority to examine the activities of those institutions that are insured by the Federal Savings and Loan Corporation, as Washing Heights is, for the purpose of protecting among other things, the interest of the associations' depositors—the "shareholders." Certainly, the investigation of the matters involved here, dealing as they did with the diversion of funds from the bank to other parties, was within the scope of that authority.

Marchisio, from April 1957, and Whipple and Seiter, beginning in October 1960, conspired among themselves and with the other defendants to commit perjury before the grand juries, to make false statements to the Federal Home Loan Bank Board, and, in Marchisio's case, also to make false statements to the Internal Revenue Service. The proof was more than sufficient to establish the alleged conspiracies and to connect appellants with them. Although the evidence was largely circumstantial, it had as much probative value as direct evidence in proving the conspiracy, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1952), and it has been held that once the existence of the conspiracy was clearly proven, each defendant's connection may be shown by acts which, viewed alone, are of relatively slight import. Poliafico v. United States, 237 F.2d 97, 104 (6 Cir. 1956), cert. den. 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed.2d 597 (1957). Here the evidence connecting each defendant was substantial.

The fact that the appellants and the other defendants participated in a joint venture from 1951 to 1955 to divert Washington Heights funds, in view of their denials of such an arrangement, would provide a motive for these same persons also to participate in conspiracies subsequent to 1956 to conceal that venture. The penalties attendant upon disclosure of such an illegal agreement were of a serious enough nature to provide such a motive. The evidence introduced with respect to the Snyder transactions is probative of appellants' intent to enter the conspiracies,[11] and, the proof that the appellants' false statements before the grand juries and to the Bank Board were similar constituted circumstantial evidence of agreements to make false statements to these bodies. Cf. Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 540, 74 S.Ct. 257, 98 L.Ed. 273 (1954). United States v. Bufalino, 285 F.2d 408 (2 Cir. 1960) is distinguishable principally because we have sufficient independent evidence here of the conspiracies.[12]

## IV. ADMISSIBILITY AND PRODUCTION OF EVIDENCE

Appellants cite numerous errors allegedly committed by that trial court in permitting the admission of certain evidence and in refusing to compel the Government to produce documents requested by appellants. Many of these claims are totally lacking in merit and require no discussion, and we hold that all the rulings were properly within the discretion of the court.

11. Both prior and subsequent acts substantially similar to the subject matter forming the basis of the indictment are admissible to prove intent, provided that such acts are not too far removed in time from the transactions in issue. United States v. Feldman, 136 F.2d 394, 399 (2 Cir. 1943), aff'd 322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408 (1944); United States v. Alker, 260 F.2d 135, 157 (3 Cir. 1958).

12. In United States v. Bufalino, supra, the Government contended that the similarity in stories of the defendants, that they had been invited to the Barbara residence for merely social purposes, was sufficient evidence to establish a conspiracy among them whereby they agreed in advance not to reveal that the meeting had been planned. This court, in reversing the judgments of conviction for conspiring to obstruct justice and commit perjury on the ground that the evidence was insufficient, stated:

"The fact that none of those present admitted that he was asked to attend a meeting for other than social purposes and that at least some of those present must have lied, does not warrant a jury's conclusion that any or all lies were told pursuant to an agreement made on November 14. There is nothing in the record or in common experience to suggest that it is not just as likely that each one present decided for himself that it would be wiser not to discuss all that he knew." Id., 285 F.2d at 415.

The Government here, of course, hardly relies for its case on the single fact that the defendants all gave similarly dishonest answers; that fact is simply one of the several elements of proof and has probative value where there is such independent evidence.

## A. Admission of Houlihan's Statements to Martocci

 Martocci testified at the trial what Houlihan, his partner, had said to him prior to 1956 and referred in particular to a conversation he had with Houlihan in which Houlihan told him that Cramer had just telephoned to ask if Colonial would act as a "conduit" for Washington Heights (the reference being to the $27,628.79 Gaynes check which Colonial received shortly thereafter). Appellants contend that this testimony was inadmissible as hearsay—an out-of-court statement made by a non-defendant who died before trial—and that it was not rendered admissible under the exception to the hearsay rule covering statements made in furtherance of a conspiracy, since Houlihan was not named as a co-conspirator and because the conversations transpired prior to the alleged acts of conspiracy (the earliest date mentioned in any of the conspiracy counts is April 1, 1957).

The Houlihan statements were properly admitted by the trial court as out-of-court statements made during and in furtherance of a joint venture which was formed to effect the diversion of funds from Washington Heights to Colonial and which was comprised of Houlihan, Cramer, Martocci and the other defendants. Houlihan and Cramer "had the sort of common purpose that makes certain declarations of one admissible against the other * * *"; United States v. Annunziato, 293 F.2d 373, 378 (2 Cir. 1961); and it was not necessary for the purpose of admissibility that a conspiracy be alleged. United States v. Annunziato, supra; United States v. Pugliese, 153 F.2d 497, 500 (2 Cir. 1945); United States v. Dennis, 183 F.2d 201, 231 (2 Cir. 1950), aff'd 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). Cf. United States v. Lev, 276 F.2d 605, 608 (2 Cir.), cert. den. 363 U.S. 812, 80 S.Ct. 1248, 4 L.Ed.2d 1153 (1960).

In admitting this evidence, the court followed our instructions in United States v. Agueci, supra. That issue has relevance here to the extent that Houlihan's and Cramer's out-of-court statements might have been considered by the jury as proof of the substantive counts against each of the defendants without there first having been established by independent evidence that the defendants were engaged in a joint venture at the time the statements were made. Judge Herlands carefully instructed the jury at the time the evidence was admitted, and later in his charge, that before it could consider out-of-court statements against a defendant it must find by independent evidence, that is, evidence of a defendant's own acts and statements, that a joint venture existed prior to 1956 and that the defendant was a member of that venture. As we have already indicated, there was abundant independent evidence of the joint venture and of appellants' participation in it.

## B. Court's Refusal to Order the Government to Produce a Memorandum of Martocci's Attorneys

 Prior to trial, defendants moved for the production and inspection of certain documents in the possession of the Government and of Colonial. One item calling for any briefs or memoranda submitted by Colonial to the Internal Revenue Service was denied by Judge Bonsal with the statement that the request could be renewed at trial. A formal motion made thereafter at trial requesting the production of a memorandum dated November 1, 1957, which was submitted by Martocci's attorneys to the Internal Revenue Service, was refused on the ground that it did not qualify as a statement under the Jencks Act, 18 U.S.C. § 3500.

After conducting a full hearing on the request, at which Martocci testified that although he had signed a later document purporting to adopt the conclusions of the November 1 memorandum, he had never read this document, the court concluded that the memorandum was neither a statement of the witness Martocci nor adopted by him, and accordingly not pro-

ducible under § 3500(e) (1).[13] The court's denial of the request was not erroneous. Campbell v. United States, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961); United States v. Aviles, 337 F. 2d 552 (2 Cir. 1964). Only those statements which could properly be called the witness' own words should be made available to the defense for the purpose of impeachment. Palermo v. United States, 360 U.S. 343, 352, 79 S.Ct. 1217, 3 L.Ed. 2d 1287 (1959).

## C. Court's Refusal to Order the Government to Produce a Memorandum of Martocci's Accountant

Without citing any authority, appellants argue that it was error for the court not to require the production of a memorandum prepared in 1956 by Martocci's accountant wherein the accountant proposed certain bookkeeping and accounting procedures for Colonial to follow in the future.

Since the accountant did not testify, the document was not producible under the Jencks Act, 18 U.S.C. § 3500(a),[14] and it did not fall within the ambit of Rule 17(c) of the Federal Rules of Criminal Procedure. Unlike the rule in civil actions, a subpoena duces tecum in a criminal action is not intended for the purpose of discovery; the document sought must at that time meet the tests of relevancy and admissibility. See 4 Barron, Federal Practice and Procedure, § 2044; United States v. Murray, 297 F. 2d 812, 821–822 (2 Cir.), cert. den. 369 U.S. 828, 82 S.Ct. 845, 7 L.Ed.2d 794 (1962). Although the document later became relevant, because of Marchisio's testimony during the trial, appellants did not renew their request for its production when afforded an opportunity to do so.

## D. Admission of Martocci's Yellow Sheets and Other Similar Records

The trial court permitted the Government to introduce into evidence, as business records, six handwritten records made and maintained by Martocci which showed the amounts Colonial had expended at Washington Heights' behest and the various sums Colonial received as reimbursement. Of particular significance in proving the case against the defendants were the "yellow sheets," 23 handwritten sheets bearing Martocci's, O'Neill's and Seiter's handwriting and containing a running account of those funds retained by Colonial.

These were properly admissible under 28 U.S.C. § 1732 which permits the admission into evidence of otherwise hearsay documents and records "made in regular course of any business" where they are offered to prove a particular transaction or event, so long as "it was in the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter." There is no merit to appellants' argument that these were private memoranda and not business records. This court, in United States v. Re, 336 F. 2d 306, 312–314 (2 Cir. 1964), cert. den. 379 U.S. 904, 85 S.Ct. 188, 13 L.Ed.2d 177 (1965), discussed at length the scope and applicability of Section 1732 and held that certain confidential records (the "DiRisi" records), although maintained secretly to avoid disclosure of their incriminating contents, were admissible under the statutory business records exception

---

13. Section 3500(e) (1) provides as follows:
 "(e) The term 'statement,' as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States means—
 "(1) a written statement made by said witness and signed or otherwise adopted or approved by him."

14. Section 3500(a) provides as follows:
 "(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) to an agent of the Government shall be the subject of, subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case."

because they "were kept on familiar ledger forms, were scrupulously regular, were made within a reasonable time after the transaction, and were prepared for a seemingly natural purpose under the specific orders of the employer." 336 F. 2d at 312. Those conditions of reliability have been satisfied here with the additional safeguard that Martocci, the one who had personal knowledge that the transactions occurred, was present in court to be questioned about the entries.

E. *Court's Refusal to Require Production of All Documentary Evidence Presented to 1961 and 1962 Grand Juries*

 Appellants contend that it was error for the trial court to deny their motion for the production of all documentary evidence presented to the 1961 and 1962 Grand Juries. The evidence, appellants claim, would have served a twofold purpose: (1) It would have helped to substantiate their allegation that the Government had convened the 1961 and 1962 Grand Juries merely for the purpose of causing appellants and the other defendants to perjure themselves; and (2), it would have assisted the defense in the cross-examination of the Grand Jury officers who were called upon to testify as to the purpose of their inquiry.

We decline to adopt a rule that would remove the traditional shroud of secrecy surrounding grand jury proceedings for either or both of the reasons asserted by appellants. Only when justice requires it or when the advantages gained by secrecy are clearly outweighed by a countervailing interest in disclosure, e. g., when there is a particularized need for the minutes, should the veil be lifted. Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 400, 79 S.Ct. 1237, 3 L.Ed. 2d 1323 (1959). That is not the case here.

## V. TRIAL COURT'S CHARGE TO THE JURY

 In its lengthy charge to the jury, the trial court, in addition to the usual instructions on reasonable doubt and other standard points, painstakingly restated the allegations and marshalled the evidence with respect to each individual defendant, enumerated the various burdens of proof that the Government was required to sustain to prove its case, instructed the jury on the meaning of the terms used in the indictment and advised them as to questions of evidence, and concluded by saying that each of the defendants must be tried separately and not collectively. Appellants now raise a variety of issues in attacking these instructions, beginning with the claim that the court prejudiced appellants' case by permitting a weekend to intervene between the summations and the charge to the jury, and including such other contentions as, for example, that the factual charge was highly prejudicial in that it overemphasized the prosecution's case and gave little time to the defendants' arguments, that the charge ridiculed the defense and misstated the defendants' points by the use of prejudicial language (such as "tricks and machinations" and "victims of a frameup"), and that the charge contained grossly erroneous statements of fact. Only one attack is made upon the legal points stated by the court—that the court committed error by interposing in its charge two sentences dealing with the duties of the individual juryman and the fact that it was the court's responsibility, and not the jury's, to determine the degree of punishment. We find all of appellants' arguments totally lacking in substance.

Appellants expressly agreed to the schedule for the summations and the charge; the length and structure of the charge were entirely proper, United States v. Dardi, 330 F.2d 316 (2 Cir.), cert. den. 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964); United States v. Agueci, supra; the language used in the charge was a fair summary of defendants' contentions throughout the trial; the facts were accurately restated. The charge was in all respects legally sufficient and correct.

## VI.

Neither the underlying facts, the conduct of the trial nor the sentences imposed bear out appellants' claim on oral argument that the nature of the present prosecution was that of a subterfuge to punish violations not otherwise subject to examination under the applicable statutes of limitations.

The judgments of conviction are affirmed in all respects.