UNITED STATES of America,
Plaintiff-Appellee,

v.

James O. McCUE, Jr., Defendant-
Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

James O. McCUE, Sr., Defendant-
Appellant.

Nos. 27, 28, Dockets 26693, 26694.

United States Court of Appeals
Second Circuit.

Argued Dec. 15, 1961.

Decided March 20, 1962.

Certiorari Denied June 25, 1962.
See 82 S.Ct. 1586.

See also, D.C., 178 F.Supp. 426.

John P. Burke, Washington, D. C.
(John B. Jones, Jr., Acting Asst. Atty.
Gen., Joseph M. Howard, Eldon F.
Hawley, Attys., Dept. of Justice, Richard
B. Buhrman, Atty., I. R. S., on the brief),
for plaintiff-appellee.

Simon H. Rifkind (of Paul, Weiss,
Rifkind, Wharton & Garrison), New
York City (Samuel J. Silverman, John
G. Simon, Allan L. Blumstein, New York
City, of counsel, and George F. Lowman,
Cummings & Lockwood, and Francis J.

McNamara, of Stamford, Conn., on the brief), for defendants-appellants.

Before LUMBARD, Chief Judge, and MOORE and HAYS, Circuit Judges.

HAYS, Circuit Judge.

Defendants appeal from judgments of conviction entered, after separate trials, upon jury verdicts finding them guilty under 18 U.S.C. § 1001 [1] of making false statements to Special Agents of the Internal Revenue Service. McCue, Jr., who was convicted on two counts, was fined $5000 and sentenced to one year in prison on each count, the terms to run concurrently and to be suspended after service of four months, after which he is placed on probation for one year. McCue, Sr., who was convicted on one count, was fined $5000 and sentenced to one year in prison, with the same provision for suspension after four months and for a year's probation. We affirm the judgments.

The McCues, father and son, were respectively President and Vice-President of the Stamford Rolling Mills Company, a corporation operating a plant for the rolling of strip copper and brass at Springdale, a suburb of Stamford, Connecticut. All of the stock of the corporation was owned by the McCue family and family trusts, McCue, Sr. owning between seventy and eighty percent of the common stock.

Sometime prior to 1952 the Internal Revenue Service undertook an investigation of the tax returns of the McCues and of the Company which eventually covered the years 1946 to 1952. From 1952 onward this investigation was in the immediate charge of Special Agent Richard Baker.

1. McCue, Sr.

On August 13, 1954, McCue, Sr., having volunteered to do so, appeared before the Treasury agents who were conducting the investigation, and testified under oath. In the course of the examination McCue, Sr. was questioned with regard to a water well which was drilled on property owned by him and occupied as a home, and which was paid for by the Company. He testified that negotiations for the work on the well were carried on by one Jack McCue, his brother, who had acted on his own initiative and without orders from McCue, Sr. When McCue, Sr. was asked: "You didn't have a thing to do with it?", he replied, "Not a thing."

The one count of the indictment on which McCue, Sr. was convicted was based upon the falsity of this answer. There was ample evidence of falsity. This evidence established that McCue, Sr. had in fact on several occasions discussed his need for more water with Downey, the purchasing agent of the Company, and sometime late in 1950 or early in 1951, in his own office and in the presence of McCue, Jr., had instructed Downey to have wells drilled on his property and on the property occupied as a home by McCue, Jr. Downey engaged the services of a company in the business of drilling wells and the two wells were drilled. Downey discussed with McCue, Sr. certain difficulties which were encountered in the course of drilling the wells. The well on the property of McCue, Sr. was about three hundred feet from his house and the derrick used in drilling it was about forty or fifty feet high. The drilling equipment makes a noise like a pile driver.

The bills for drilling the wells were paid by the Company and charged to "Repair Expenses," which were taken as a deduction in the corporate income tax return.

Jack McCue had nothing whatever to do with the well drilling or the negotia-

1. § 1001. Statements or entries generally. "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudu-lent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

tions, and the men in charge of the drilling had never even heard of him.

## 2. McCue, Jr.

On August 31, 1954, McCue, Jr. appeared voluntarily before the Treasury agents and was examined under oath by Special Agent Baker. He was questioned about certain travel vouchers, i. e. vouchers for reimbursement by the Company of the expenses of trips made on company business. Special Agent Baker asked him specifically: "Were you at all times at the places shown on the dates shown on these memos?" McCue, Jr. replied: "Yes. To the best of my knowledge we were; yes."

The falsity of this answer was the basis for the first of the two counts on which McCue, Jr. was convicted. The evidence amply establishes its falsity. The Government was able to show from corporate records, including the gatemen's books, cafeteria slips and telephone toll slips and from the records of the McCues' country club that they were in fact at the plant or nearby on the dates on which, according to the travel vouchers, they purported to be in other cities.

In the course of the same examination of August 31, 1954, McCue, Jr., was also asked about the wells drilled at Company expense on his and his father's property. The questions and his answers were:

"Q. Who negotiated to have this well drilled at your place? A. I haven't any idea, not even to this day.

"Q. Who paid for the well drilling operation? A. I don't know.

"Q. Did you? A. No, sir. I didn't need it. I didn't want it. I didn't authorize it, and knew nothing about it."

The falsity of these answers was the basis for the second count on which McCue, Jr. was convicted. The evidence amply established their falsity. McCue, Jr. ordered the well drilled, examined,

discussed and accepted the proposal provided by the firm engaged for the work, and ordered them to undertake it. He was kept informed of the work on the well as it proceeded and discussed its progress with drillers. He went with them to choose a spot on his property for drilling the well. As with his father the location of the well drilling equipment, its size and the noise of the operation make it impossible that he was unaware that a well was being drilled on his property.

## I.

### Section 1001

Appellants urge that Section 1001 is not applicable to the conduct for which they were convicted.

Analysis of the Section reveals no ambiguity. The elements of the offense are 1) a statement, 2) falsity, 3) that the false statement be made "knowingly and willfully," and 4) that the false statement be made in a "matter within the jurisdiction of any department or agency of the United States." See United States v. Silver, 235 F.2d 375 (2d Cir.), cert. denied, 352 U.S. 880, 77 S.Ct. 102, 1 L.Ed.2d 80 (1956).

However, in spite of what would appear to be the plain meaning of the statute, we are pressed by appellants to consider the legislative background. It is said to be significant that the statute in its present form resulted from amendment of a previous statute [2] which was designed particularly to punish the presentation to the government of false and fraudulent claims. The legislative history of the present statute as it was originally enacted in 1934 is very scanty. It shows that among the reasons for the amendments which were then adopted were the prevention of false reports on shipments of "hot oil" and false statements of wages paid on Public Works Administration projects.[3] The legislative history does not suggest that the purpose of the amendment was in any way intended to

---

2. 40 Stat. 1015 (1918).

3. S.Rep. No. 1202, 73d Cong., 2d Sess. 1 (1934); 78 Cong.Rec. 11270 (1934).

be confined to the specific situations which were mentioned. The very broad language of the amendment suggests that these situations were merely cited as examples of the kind of conduct which the statute was designed to prohibit. And the quite different character of the two examples which were given may also be taken as representing the broad application intended for the statute.

"A greater variety of false statements were meant to be included. There is no indication in either the committee reports or in the congressional debates that the scope of the statute was to be in any way restricted." United States v. Bramblett, 348 U.S. 503, 507, 75 S.Ct. 504, 507, 99 L.Ed. 594 (1955).

The main thrust of appellant's argument with respect to Section 1001 is that the Section is intended to protect the processes of government from interference and obstruction and not to require "the citizen to speak truthfully to police officers."

There is no reason to believe that the administration of the tax laws and the collection of taxes is not one of the processes of government which the statute was designed to protect, or that making false statements about taxes to the representatives of the Treasury is not the kind of interference and obstruction which the statute was intended to prevent.

The case of the citizen who replies to the policeman with an "exculpatory 'no'" can be left until it arises. See United States v. Davey, 155 F.Supp. 175 (S.D.N.Y.1957); United States v. Stark, 131 F.Supp. 190 (D.Md.1955). It is sufficient for the present to point out that the case at bar bears no resemblance to such a situation. Here the appellants voluntarily appeared before three representatives of the Treasury under circumstances in which they were well aware of the nature and purpose of the examination. They were accompanied by counsel and they were questioned under oath. It does not seem to us that a statute which requires truthful answers in such a situation tends in any way "to distort the relationship in this country between a citizen and his government," as the appellants would have us believe.

■ The great weight of judicial authority supports the applicability of Section 1001 to the circumstances of the present case. The recent cases in which the Supreme Court has concerned itself with the Section contain no suggestion of confining the effect of the statute to any smaller area than that encompassed by its own broad language. On the contrary there are indications that the Court rejects any theory of narrow applicability.

"The [1934] amendment indicated the congressional intent to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described. We see no reason why this apparent intention should be frustrated by construction." United States v. Gilliland, 312 U.S. 86, 93, 61 S.Ct. 518, 522, 85 L.Ed. 598 (1941).

In United States v. Beacon Brass Co., 344 U.S. 43, 46, 73 S.Ct. 77, 79, 97 L.Ed. 61 (1952), the Court referred to Section 1001 as "a statute specifically outlawing all false statements in matters under the jurisdiction of agencies of the United States."

See also United States v. Bramblett, supra.

In Cohen v. United States, 201 F.2d 386, 392 (9th Cir.), cert. denied, 345 U.S. 951, 73 S.Ct. 864, 97 L.Ed. 1374 (1953), the Court of Appeals for the Ninth Circuit characterized Section 1001, as

"a statute based upon the broad public policy against the making of false statements in *any* matters within the jurisdiction of *any* department or agency of the United States." (Emphasis in the original.)

Among the cases which have upheld convictions of taxpayers under Section 1001 for making false statements to revenue agents are: United States v. Brott,

264 F.2d 433 (2d Cir.), cert. denied, 359 U.S. 985, 79 S.Ct. 941, 3 L.Ed.2d 933 (1959); Cooper v. United States, 282 F.2d 527 (9th Cir. 1960); United States v. Clancy, 276 F.2d 617 (7th Cir. 1960), rev'd on other grounds, 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574 (1961); Smith v. United States, 257 F.2d 133 (10th Cir. 1958); Knowles v. United States, 224 F.2d 168 (10th Cir. 1955).

The only case to which we have been cited which supports a contrary result is United States v. Philippe, 173 F.Supp. 582 (S.D.N.Y.1959). We reject the reasoning and the result in that decision.

We conclude that the conduct of the defendants falls clearly within the express language of the statute, that there is nothing in the legislative background of the statute to indicate that the statute was not intended to apply to the defendants' conduct, and that the applicability of the statute to the defendants' conduct is supported by the overwhelming weight of judicial authority.

■ The appellants' contention that Section 1001 does not apply to oral statements is disputed by the language of the statute itself which penalizes the making of "any false, fictitious or fraudulent statements" as well as the making or using of "any false writing or document." See United States v. Beacon Brass Co., supra, at p. 344 U. S. at 46, 73 S.Ct. at 79; Cooper v. United States, supra; Smith v. United States, supra; Marzani v. United States, 83 App.D.C. 78, 168 F.2d 133, aff'd by an equally divided court, 335 U.S. 895, 69 S.Ct. 299, 93 L.Ed. 431 (1948); United States v. Zavala, 139 F.2d 830, 831 (2d Cir. 1944).

■ The appellants' other contentions with respect to Section 1001 are equally without merit. Not having raised the point in the lower court, the appellants cannot now rely on the two-witness rule. In any event the rule has been held to be inapplicable to prosecutions under Section 1001. Fisher v. United States, 254 F.2d 302 (9th Cir.), cert. denied, 358 U.S. 895, 79 S.Ct. 157, 3 L.Ed.2d 122 (1958); United States v. Killian, 246 F.2d 77 (7th Cir. 1957); Todorow v. United States, 173 F.2d 439 (9th Cir.), cert. denied, 337 U.S. 925, 69 S.Ct. 1169, 93 L.Ed. 1733 (1949). Even if there is a separate requirement of "materiality," and we held in United States v. Silver, 235 F.2d 375 (2d Cir.), cert. denied, 352 U.S. 880, 77 S.Ct. 102, 1 L.Ed.2d 80 (1956) that there is not, the false statements involved in the present case were clearly material to the investigation.

## II.

### Compromise and Estoppel

The appellants were indicted in 1957 for tax evasion in violation of Section 145(b) of the Internal Revenue Code of 1939. There followed a series of conferences between counsel for appellants and the United States Attorney. As a result of these conferences it was agreed that McCue, Sr. would plead *nolo contendere* to charges under Section 145 (a) (misdemeanor), and that the United States Attorney would recommend acceptance of that plea and dismissal of the indictment against McCue, Jr. While the exact confines of the agreement were never clearly defined, it may be assumed, for our purposes, that both the United States Attorney and counsel for defendants understood that the offenses which are the subject of the present prosecution were to be included in the agreed upon disposition of the matter.

Immediately after the conclusion of the final conference the attorneys appeared before Judge Anderson in the District Court. Judge Anderson, after hearing the representations of the United States Attorney, accepted the *nolo contendere* plea of McCue, Sr. and dismissed the indictment against McCue, Jr. McCue, Sr. was fined $20,000, sentenced to one year of imprisonment with execution suspended and placed on probation for two years.

■ The appellants urge that these proceedings constituted a statutory compromise of their liability [4] and also that

---

4. 68A Stat. 849 (1954); 26 U.S.C. § 7122 (a) (1958).

the government was estopped, by reason of the proceedings, from prosecuting them under Section 1001. (Since the offense for which McCue, Sr. was punished was the filing of false and fraudulent tax returns for 1951 and 1952, while the present prosecution is for making false statements in 1954, the additional plea of double jeopardy can be dismissed without comment.)

██ Under the circumstances as they then existed, any compromise, whether statutory or other, required the concurrence of the District Judge, since he was obliged to pass upon the propriety of accepting McCue, Sr.'s plea of *nolo contendere* and the dismissal of the indictment as to McCue, Jr. Yet no mention of any compromise was made to Judge Anderson. The false statements which are the basis for the present prosecution were not referred to at any time in the course of the proceedings before Judge Anderson, and, of course, the indictments which were the subject of those proceedings did not include or have any relevance to the false statements for which McCue, Sr. and McCue, Jr. have been convicted in the present case.

As Judge Anderson said:

"Moreover, the defendants are themeselves barred from raising the issue of an estoppel based upon the claimed agreement because the carrying out of the agreement involved the dismissal of two indictments which necessitated action by the court. Under these circumstances the court is entitled to a full and complete disclosure of all of the circumstances surrounding the motion for dismissal. It is apparent from the face of the record and the defendants' claims that there was not disclosed to the court at the time the motion was made to dismiss the indictments, two features of the agreement which would have vital consequences: first, that McCue, Sr. had agreed to submit himself to punishment, both for himself and for McCue, Jr.; and, second, that the U. S.

Attorney had agreed to grant plenary immunity from prosecution on any and all charges which might be derived from the investigative file." United States v. McCue, 178 F.Supp. 426, 437 (D.Conn.1959).

There were certain other aspects of the case of which Judge Anderson was also not aware. The United States Attorney represented to the Court that there was considerable doubt whether a prosecution under § 145(b) could be successful. The overwhelming evidence of guilt presented in the present prosecution raises a question of how such a doubt could possibly have existed. Before entering into the supposed agreement to accept McCue, Sr.'s plea of *nolo contendere* to misdemeanor charges under § 145(a) the United States Attorney had requested of the Department of Justice permission to prosecute the case as a misdemeanor under § 145(a) rather than as a felony under § 145(b), and such permission had been firmly refused. In agreeing to accept McCue, Sr.'s plea of *nolo contendere* to charges under § 145(a), the United States Attorney was, therefore, proceeding not only without the authorization of the Department, but contrary to its express instructions.

If the alleged agreement between counsel for the appellants and the United States Attorney was to operate as a compromise or an estoppel with respect to prosecution under Section 1001 for making false statements, then it was the duty of appellants' counsel to make it clear to the Court that, by accepting McCue, Sr.'s plea of *nolo contendere* the Court was at the same time disposing finally of any charges which might be made under Section 1001.

Since we are persuaded that there could have been no effective compromise or estoppel without full disclosure to the Court, we find it unnecessary to pass upon the other objections which have been raised, such as the United States Attorney's lack of power to enter into such a compromise agreement or to effect an estoppel against the United States.

### III.

We have carefully examined the remaining assignments of error and have concluded that they present no ground for reversal of these convictions.

The judgments are, therefore, affirmed.