**UNITED STATES of America,**

v.

**Hermena PERLMUTTER, Defendant.**

**No. 86 Cr. 207 (RWS).**

United States District Court, S.D. New York.

Feb. 19, 1987.

See also 637 F.Supp. 1134.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for U.S.; John M. McEnany, Asst. U.S. Atty., of counsel.

Kantor, Davidoff, Wolfe, Rabbino & Kass, P.C., New York City, Kaplowitz and Wise, Linden, N.J., for defendant; Herbert C. Kantor, New York City, Leo Kaplowitz, Linden, N.J., of counsel.

## OPINION

SWEET, District Judge.

Hermena Perlmutter ("Perlmutter") has been indicted and tried for money laundering, once in March, 1981 and again in October, 1982, and for making a false statement to an Internal Revenue Service ("IRS") agent. Specifically, Counts One and Seven of the second superseding indictment charge Perlmutter with causing material information to be concealed from the IRS by trick, scheme or device, in violation of 18 U.S.C. §§ 1001 and 2(b). Counts Two and Eight charge Perlmutter with causing a financial institution to fail to file currency transaction reports in violation of 31 U.S.C. § 1058 (in effect in March, 1981) and 31 U.S.C. § 5322(a) (the recodification of 31 U.S.C. § 1058, in effect in October, 1982). Count Ten charges Perlmutter with the making of a false statement on May 9, 1984, in violation of 18 U.S.C. § 1001.

This was a particularly hard case, well tried by skillful counsel for both the government and Perlmutter. It is painful to see a well-regarded defense counsel in the role of a defendant when the result turns upon a legal definition of intent and aiding and abetting under a since-amended statute, a definition about which reasonable men by definition can differ. Further, the difficulties are increased by the proof which overcame the presumption of innocence by the application of rational inference rather than the resolution of the credibility of witnesses with respect to a contested fact. Notwithstanding, on the facts as found below after a four-day bench trial, Perlmutter is found guilty on Counts Seven and Eight, and not guilty on Counts One, Two, and Ten.

### Prior Proceedings

The original two-count indictment was filed in this case on March 10, 1986. The nine-count superseding indictment, filed April 17, 1986, was the subject of a motion to dismiss Counts One through Eight pursuant to Fed.R.Crim.P. 12(b)(2) on the grounds that these counts were facially insufficient. In its opinion of May 20, 1986, relying upon the analysis contained in *United States v. Anzalone,* 766 F.2d 676 (1st Cir.1985), this court dismissed Counts One through Eight on the basis that private persons like Perlmutter cannot incur criminal liability for apportioning transactions to avoid reporting requirements imposed on financial institutions. The government appealed from this decision.

On June 27, 1986, while this case was on appeal, the Second Circuit, in *United States v. Heyman,* 794 F.2d 788 (2d Cir. 1986), held contrary to the conclusion reached by the First Circuit in *Anzalone* and to the effect that under 31 U.S.C. §§ 5311, 5313, and 5322, a private party could be convicted of willfully causing transactions to be structured so as to cause a financial institution to fail its legal responsibility to file currency transaction reports. In light of that opinion, this court on the government's motion reversed its prior decision.

On June 11, 1986, the second superseding indictment was filed. Before trial, Counts Three through Six were dismissed on motion of the government. On the first day of trial, January 27, 1987, the court granted the government's motion to sever Count Nine, which charges Perlmutter with obstruction of justice in violation of 18 U.S.C. § 1503.

### Findings of Fact

Perlmutter is an attorney whose practice consists mostly of criminal defense and who capably acted for the defense in at least two trials before me. During the period in question, Perlmutter had an office at 20 Vesey Street. In her employ were Laura Nadal ("Nadal"), who acted as secre-

tary and receptionist, and Perlmutter's nephew, David Van Muraskin ("Muraskin"), an attorney.[1] Muraskin worked both on Perlmutter's cases and on his own § 18(b) cases.

In early 1981, Perlmutter assisted her client Daniel Washington ("Washington") (later convicted of drug offenses), who declared little or no income for the years 1979–1982, in the purchase of four apartment buildings located at the corner of Seventh Avenue and 134th Street. The contract price was $60,000—$6,000 of which was paid as a down payment by a check drawn by Perlmutter on her special account on January 29, 1981.[2] On March 2, Perlmutter incorporated for Washington the 2283 7th Avenue Corporation. At the closing on March 12, 1981, the balance of the purchase price was paid by monetary instruments obtained as follows:

With cash supplied by Washington, Perlmutter on March 11, 1981, purchased $29,000 in Emigrant Savings Bank ("Emigrant") tellers' checks at her local branch.[3] The checks were in amounts of $1,000, $2,000, $3,000, $4,000, and $5,000, made payable to Preston Homes, Inc.; $5,000 and $5,000, made payable to 2283 7th Avenue Corporation; and $1,000, $1,000, and $2,000, made payable to Hermena Perlmutter.[4] The manager of Perlmutter's branch of Emigrant, Evelyn McLoughlin ("McLoughlin"), filled out a Currency Transaction Report ("CTR") for this transaction. McLoughlin testified that she almost always told customers at the time of the transaction that she was filling out a CTR. She explicitly recalled telling Perlmutter that she was doing so on one occasion, to which Perlmutter replied, "I have no objection to that. I have nothing to hide."

On the same day, March 11, $9,800 in cash was deposited in Perlmutter's special account at the Broadway branch of Merchants Bank of New York ("Merchants"), and $9,800 in cash was deposited in Muraskin's special account at the same branch.[5] The deposit slips for each were time-stamped 1:43 p.m. and 1:44 p.m., respectively, by the same teller. The handwriting on the deposit slips could not be identified by the government's handwriting expert as belonging to either Perlmutter or Muraskin, but it was identified as belonging to the same writer. The slip for the deposit into Perlmutter's account was pre-printed with Perlmutter's name and account number; the slip for the Muraskin deposit was a blank deposit slip, available at the bank, with Muraskin's name and account number filled in.

On the next day, the morning of the closing, $200 was deposited in each of Perlmutter's and Muraskin's special accounts at the Third Avenue branch of Merchants. The deposit slip for the Perlmutter deposit, which was time-stamped 9:28, was pre-printed with Perlmutter's name and account number, and the writing was identified as Perlmutter's. The slip for the Muraskin deposit, time-stamped 9:29, was also pre-printed with Muraskin's name and account number.

That same day, Perlmutter and Muraskin each drew a certified $10,000 check on their respective special accounts, payable to the 2283 7th Avenue Corporation. These checks for a total of $20,000 were not actually used at the closing; instead Perlmutter drew a check for $20,500 on her special account, payable to the Title Guarantee Company, to cover back taxes. The $29,000 in tellers' checks were given to Jerry

---

1. Seth Kaplowitz, another of Perlmutter's nephews, also worked in the office at some time during this period, but no evidence was produced which would link him with any of the transactions at issue.

2. Jerry Brown, the seller of the property, testified that the signing of the contract was handled by his attorney and Perlmutter. Brown did not meet Washington until the day of the closing.

3. Perlmutter actually purchased a total of $33,290.00 in tellers' checks, but only $29,000 of

those checks were shown to have been paid to Preston Homes in connection with this transaction.

4. At the Emigrant Savings Bank, the only limit to the amount for which a tellers' check can be drawn for a customer is one million dollars.

5. The two $9,800 deposits are the subject of the violations charged in Counts One and Two.

Brown, the president of Preston Homes, the seller of the property, at the closing on March 12, 1981.[6] The two $10,000 checks were endorsed back to Perlmutter and Muraskin, respectively, by Washington, and deposited into Perlmutter's account the next day, March 13, by Muraskin at the Third Avenue branch at 9:35 a.m.

The subject of Counts Seven and Eight is a transaction in connection with a purchase of real estate participated in by Perlmutter, in August through October, 1982, on behalf of her clients Peter Monsanto ("Monsanto") and Debra Manson ("Manson") for the purchase of a cooperative apartment at 3240 Riverdale Avenue in the Bronx. Monsanto and Manson, like Washington, reported no income for the years 1978 through 1982. Monsanto first sought to purchase the co-op in the name of Doll Holding Corp., which Perlmutter had incorporated for him in November, 1981. When the seller refused to sell to a corporation, Monsanto first had the contract drawn up in his name, but then substituted Manson's name.

The purchase price for the co-op was $30,000, $3,000 of which was paid in August, 1982, and the remaining $27,000 of which was paid at the time of closing in October, 1982. Nadal testified that in connection with this transaction Monsanto brought to Perlmutter's office an attache case containing $25,000 to $30,000 in small bills, which she and Monsanto counted. Nadal then gave the attache case to Perlmutter when Perlmutter returned to the office. The remaining $27,000 was paid with the following checks and money orders:

On October 13, Nadal purchased a $5,000 cashier's check from Republic National Bank, to the order to Hermena Perlmutter. On the following day, October 14, Nadal purchased another $5,000 Republic cashier's check to the order of Hermena Perlmutter. On the back of each check Perlmutter wrote "Re: Purchase of Co-op shares, 3240 Riverdale Ave., Apt. 6E, Bronx, N.Y."

That same day, ten $500 money orders were purchased from Union Federal Savings. All were made to the order of T & C Builders Co. and labelled "Re: Purchase of 3240 Riverdale," in Muraskin's handwriting. In addition, half of them were undated and listed Manson as "sender," in Muraskin's handwriting; the other half were dated October 14, 1982 and listed Manson as "sender," all in Perlmutter's handwriting.

Also on October 14, two different tellers at the Emigrant convenience branch issued two tellers' checks; one for $5,000 to the order of Hermena Perlmutter, the other for $7,000 to the order of Manson. On the back of each check Perlmutter wrote "Re: Purchase of Co-op shares, 3240 Riverdale Ave., Apt. 6E, Bronx, N.Y." The check request form for the $5,000 check was filled out by Muraskin. Although McLoughlin testified that she had searched the bank records and could not find the check request form for the check made out to Manson, she testified that Manson was not a customer of the bank and tellers' checks were only issued to customers (money orders were given to non-customers). McLoughlin also testified that Muraskin often came to the bank on behalf of Perlmutter. The two Emigrant tellers' checks are the subject of Counts Seven and Eight of the indictment.

**Count Ten**

In August, 1981, Perlmutter participated in the purchase of a house at 35 Mountain Way, West Orange, New Jersey, by Glen and Diane Brown, who, like Washington, Monsanto and Manson, filed no tax returns for the years 1979–1982. The agreed price for the house was $140,000, with $14,000 as a down payment and the balance at closing. Perlmutter herself signed the contract of sale, which did not refer to the Browns. Perlmutter arranged to make the $14,000 down payment through the following transactions:

On August 19, 1981, Perlmutter purchased four Emigrant Savings Bank tellers' checks, in denominations of $5,000,

---

**6.** Present at the closing were Perlmutter, Washington, Jerry Brown, the Title Guarantee Company representative, and a man identified by Jerry Brown as a "relative" of Perlmutter's.

$3,500, $3,500 and $2,000. A CTR was filed for this transaction. The next day, August 20, those tellers' checks were deposited into her special account at Merchants, at two different times in the day. Two of the checks, for $5,000 and $3,500, were deposited at 9:13 a.m. on August 20 at the Third Avenue branch, using two separate deposit slips, dated August 19 and filled out in Perlmutter's handwriting. The other two checks were deposited at 1:22 p.m., also using two separate deposit slips dated August 19, and in Perlmutter's handwriting. Perlmutter drew a $14,000 check, dated August 19 on her special account, payable to the sellers of the house.

The balance of the purchase price was paid at the closing on November 9, 1981. The deed to the property listed Saul and Ruth Robbins as seller, and 35 Mountain Way Corporation, a corporation formed by Perlmutter for the Browns, as buyer. At 2:13 p.m. that day, Perlmutter deposited $120,000 in $10s and $20s into her special account at the Third Avenue branch of the Merchants Bank using a non-preprinted deposit slip. A CTR was filed for this transaction. She then drew a certified check for $120,000 on that account, payable to Ruth and Saul Robbins, and added a check for $89.76 and a Merchants teller's check for $6,000 to make up the balance.

During an IRS investigation of Washington, Special Agent Gregory Polvere ("Polvere") had discovered the CTR filed in connection with Perlmutter's $120,000 deposit on November 9, 1981. Because the transaction occurred one day after a raid on a building owned by Washington at 119 West 130th Street, in which large quantities of narcotics and money were seized, Polvere suspected that the $120,000 might have been cash paid by Washington to Perlmutter in connection with proceedings following that search. Thereafter, on or about January 30, 1984, a grand jury subpoena was issued to Merchants for the relevant records, but the bank was unable to produce records for November and December of 1981. On May 9, 1984, Polvere inter-

viewed Perlmutter at her office.[7] In response to questions about the $120,000 deposit, Perlmutter stated that the $120,000 belonged to someone other than Washington, whom she refused to identify. She told Polvere that the bank had contacted her to ask her for her November, 1981 statement, that she had searched her files and was unable to find it, and had no idea where the check or corresponding statement was. She said she had no objection to giving the statements to them, but she just could not find them. She also told Polvere that she would not discuss her dealings with clients with him.

During a subsequent IRS civil audit of Perlmutter, Special Agent Richard Burnside requested Perlmutter's attorney, Donald Israel ("Israel"), to furnish materials relating to the $120,000 deposit. Israel asked Bernard Tobacman ("Tobacman"), a CPA who did accounting work for Perlmutter, to get the documents from Perlmutter's office. Tobacman went to the box in a cabinet in Perlmutter's office where he knew the bank records for the past four or five years were kept and found and copied the bank records in question. Tobacman also testified that Perlmutter's two or three most recent statements were kept in her desk drawer, until either he or his daughter, also an accountant, entered them into records and put them in the box.

### Conclusions

Perlmutter is alleged to have violated 18 U.S.C. §§ 1001 and 2(b) by knowingly withholding from the government material information concerning the two $9,800 deposits on March 11, 1981 (Count One) and material information concerning the $5,000 and $7,000 transactions on October 14, 1982 (Count Seven). She is also alleged to have violated 31 U.S.C. §§ 5312(a)(2), 5313 and 5322 and 18 U.S.C. § 2(b) by causing the Merchants Bank to fail to file a CTR in connection with the two $9,800 deposits on March 11, 1981 (Count Two) and causing the Emigrant Bank to fail to file a CTR in

---

**7.** Although Special Agent James MacKenna was also present at the interview, he did not testify at trial.

connection with the $5,000 and $7,000 transactions on October 14, 1982 (Count Eight).

The Currency and Foreign Transactions Reporting Act, presently codified in 31 U.S.C. §§ 5311 et seq., authorizes the Secretary of the Treasury to require financial institutions to file "certain reports or records hav[ing] a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." 31 U.S.C. § 5311. Section 5313(a) provides that a domestic financial institution, involved in a transaction for the payment, receipt, or transfer of United States currency in an amount or under circumstances that the Secretary prescribes, shall file a report in the time and manner that the Secretary prescribes. 31 U.S.C. § 5313(a).[8] The Secretary's regulations in effect at the time of these events are set forth in 31 C.F.R. § 103.22(a) (1982):

> Each financial institution shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution, which involves a transaction in currency of more than $10,000. Such reports shall be made on forms prescribed by the Secretary and all information called for in the forms shall be furnished.

The reporting form which the Secretary issued during the relevant period contained the following statement:

> Multiple transactions by or for any person which in one day total more than $10,000 should be treated as a single transaction if the financial institution is aware of them.

IRS Form 4789.

In *United States v. Heyman*, 794 F.2d 788 (2d Cir.1986), the Second Circuit held that deposits totaling over $10,000, made at the same financial institution on the same day, trigger a CTR filing requirement under 31 U.S.C. § 5313(a). Although the statute applies on its face to financial institutions alone, the Court held that private persons could be convicted of willfully structuring transactions so as to cause a financial institution to fail to file a CTR.

The court stated that although the facts involved an employee of the institution, a customer who structured his transactions with the intent to conceal from the institution the need to file a CTR would be criminally liable under § 2(b) for causing the bank to violate the reporting requirement. *See* 794 F.2d at 792 n. 6. This, the Court noted, was a necessary result of the language of 18 U.S.C. § 2(b) which does not distinguish between customer and employee when it provides that *"[w]hoever* willfully causes an act to be done which if directly performed by him would be an offense against the United States" is liable for that act.

In the intervening period between Perlmutter's financial transactions and the present, Congress explicitly imposed liability on private persons for the conduct at issue here, *see* 26 U.S.C. § 6050I (West Supp.1986), thus placing a reporting burden on any person who receives in excess of $10,000 in one or two or more related transactions:

> (a) Cash receipts of more than $10,000.00
> —Any person—
>> (1) who is engaged in a trade or business, and
>> (2) who, in the course of such trade or business, receives more than $10,000 in cash in 1 transaction (or 2 or more related transactions),
> shall make the return described in subsection (b) with respect to such transaction (or related transactions) at such time as the Secretary may by regulations prescribe.

The present case, of course, is being tried under 31 U.S.C. § 5313(a), which does not by its express terms address the conduct of persons other than financial institutions.

▬ The government must show on each of Counts Two and Eight 1) that the defendant caused the financial institution to fail to file a CTR when it was required to do so and 2) that the defendant acted "willfully" in causing the institution to fail to file a CTR. In order to act "willfully," the defendant must know that banks are

---

**8.** The corresponding section of former Title 31, 31 U.S.C. § 1081, was essentially the same.

required to report currency transactions totalling over $10,000 to the government, and have intended to foil that reporting obligation. *See United States v. Nersesian*, S 84 Cr. 1034 (charge of the court at Tr. 10,705–10). Circumstantial evidence alone is often sufficient to show criminal intent. *See United States v. Natelli*, 527 F.2d 311, 318 (2d Cir.1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976).

■ The charges under Counts One and Seven of violations of 18 U.S.C. § 1001 involve the same acts on the part of Perlmutter. Section 1001 provides that:

> Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device, a material fact ... shall be fined not more than $10,000 or imprisoned not more than five years, or both.

While the concealment of a fact that no one has a legal duty to disclose may not be a violation of this section, *see United States v. Irwin*, 654 F.2d 671, 678 (10th Cir.1981), *cert. denied*, 455 U.S. 1016, 102 S.Ct. 1709, 72 L.Ed.2d 133 (1982), such is not the case where a regulation or form requires disclosure. *Id., cited in United States v. Tobon-Builes*, 706 F.2d 1092, 1097 (11th Cir.1983). Although the reporting requirements under the Currency and Foreign Transactions Reporting Act apply on their face only to financial institutions, the *Heyman* court's interpretation of 18 U.S.C. § 2(b) requires the conclusion that under 18 U.S.C. § 1001 as well as 31 U.S.C. §§ 5311 *et seq.* the customer of a financial institution is required to disclose that cumulative deposits of over $10,000 are in fact all one transaction. *See Heyman, supra*, 794 F.2d 788; *see also Tobon-Builes, supra*, 706 F.2d at 1099. This is so "even though the financial institutions had no criminal intent and thus were innocent of any concealment under section 1001." *Tobon-Builes, supra*, 706 F.2d at 1100; *see Heyman, supra*, 794 F.2d 788.

■ An essential element of a violation of 18 U.S.C. § 1001 is that the fact concealed is material. *See United States v. Marchisio*, 344 F.2d 653, 666 (2d Cir.1965). In this case, the facts alleged to have been concealed are that "split" transactions were in reality part of the same transaction. Where, as here, the large currency transactions were on behalf of non-taxpaying clients and where the purpose of the concealment was to avoid the filing of CTR's, which have been found by Congress to have a "high degree of usefulness in criminal, tax, or regulatory investigations or proceedings," the concealment of the fact that the multiple transactions were in fact a single transaction is material as a matter of law.

■ The currency transactions at issue were clearly within the jurisdiction of a department or agency of the United States, specifically the Department of the Treasury, Internal Revenue Service. The government is not required to prove that the defendant knew that the statement was within the jurisdiction of a federal agency. *See United States v. Yermian*, 468 U.S. 63, 104 S.Ct. 2936, 82 L.Ed.2d 53 (1984).

■ Therefore, the remaining elements of a violation of 18 U.S.C. § 1001 are that 1) the defendant concealed the fact that multiple currency transactions were in fact one transaction; 2) she did so by trick, scheme, or device, and 3) that she acted willfully and knowingly. As in the case of willfulness, a defendant's knowledge may be shown by circumstantial evidence. *See United States v. Sheiner*, 410 F.2d 337, 340 (2d Cir.), *cert. denied*, 396 U.S. 825, 90 S.Ct. 68, 24 L.Ed.2d 76 (1969).

**Counts One and Two**

The government has shown that Perlmutter's office participated in the negotiations and preparation of documents in connection with the Washington transaction and obtained the financial instruments used in that transaction. On January 29, 1981, Perlmutter drew a check for $6,000 as a down payment for the Seventh Avenue properties, pursuant to the contract between Preston Homes and Washington. On March 2, she incorporated the 2283 7th

Avenue Corporation on Washington's behalf. On March 11, she purchased, with cash supplied by Washington, eight tellers' checks for a total of $29,000, made payable to herself and to 2283 7th Avenue Corporation. On that same day, $9,800 in cash was deposited in each of Perlmutter's and Muraskin's special accounts at a different bank, Merchants. The depositor used Perlmutter's preprinted form for one $9,800 deposit, and knew Muraskin's account number for the other. The next morning, $200 was deposited in each account, enabling Perlmutter and Muraskin to each draw checks of $10,000, made payable to 2283 7th Avenue Corporation. The deposit slip for the $200 deposit in Perlmutter's account was filled out by Perlmutter; the deposit slip for the $200 deposit in Muraskin's account was filled out by Muraskin. Each of the $10,000 checks were deposited the next day into Perlmutter's account by Muraskin, using a preprinted form. They were used to cover a $20,500 check written by Perlmutter to the Title Guarantee Company for back taxes on the property.

■ Regardless of Perlmutter's extensive participation in the Washington transaction and her position as aunt and employer of David Muraskin, there is reasonable doubt that she participated in or directed the splitting of the $19,600 deposit into two separate $9,800 deposits. Earlier that same day, she took $29,000 in cash to Emigrant Savings Bank, for which a CTR was filed. There is no evidence to explain why she would avoid the filing of a CTR on one part but not all of a large cash transaction, nor any evidence as to when she first became aware of the CTR procedure. Furthermore, the handwriting expert could not identify the handwriting on the deposit slips as belonging to her, and Laura Nadal identified it as David Muraskin's. The possibility exists that Perlmutter gave Muraskin the cash to take to Merchants, and that he, without her knowledge or direction, decided to break up the deposit. One of the deposit slips was preprinted with her name and account number, but the other was a form obtainable at the bank. This evidence fails to establish proof beyond a reasonable doubt as to Perlmutter's intent.

## Counts Seven and Eight

The government has established that Perlmutter participated in a similar fashion in Monsanto's purchase of the Riverdale co-op in August through October, 1982, but with an intent clarified by the preceding events. A year before, Perlmutter had incorporated for Monsanto the Doll Holding Corporation, in whose name Monsanto first attempted to buy the co-op. In October, 1982, Nadal purchased two $5,000 cashier's checks from Republic National on consecutive days, made to the order of Hermena Perlmutter. Ten $500 money orders were purchased from a separate bank on the second day, October 14, half of which were filled out in part by Perlmutter, and the remainder by Muraskin. That same day, two tellers' checks were purchased from yet another bank, from different tellers, and made out to different payees. The request form for the $5,000 check, payable to Hermena Perlmutter, was filled out by Muraskin. Although the co-op was purchased by Monsanto, his name does not appear on any checks, the contract, the deed of sale, or money orders. On each of the checks and money orders, however, appears the legend: Re purchase of Co-op, 3240 Riverdale.

■ From the credible testimony of Evelyn McLoughlin, the Emigrant branch manager, who testified that she almost always told her customers when she was filling out a CTR and remembers explicitly telling Perlmutter such on one occasion, it is a reasonable inference that at least as of the time of this transaction and as a consequence of the Washington transaction Perlmutter had the requisite knowledge under 18 U.S.C. § 1001 and § 2 of the CTR reporting requirements.

By October, 1982, McLoughlin had filled out all three CTR's filed on Perlmutter's behalf by Emigrant, and, therefore, had certainly told her of at least one CTR filing. In addition, Nadal, although she had an acknowledged grievance against Perlmutter arising out of her discharge, testified that she overheard at the time of the

Washington transaction a conversation between Perlmutter and Tobacman in which CTR's were discussed. Neither the government nor Perlmutter asked Tobacman about the conversation reported by Nadal which at most is icing on the inference arising from the undisputed facts.

The circumstances surrounding the Monsanto transaction demonstrate Perlmutter's intent to circumvent the requirements, as well as her connection to the $5,000 and $7,000 transactions. The testimony of Nadal about delivery of cash in the briefcase by Monsanto has the ring of truth, despite Nadal's hostility to Perlmutter. It is entirely reasonable to infer that Perlmutter, on this occasion, directed people in her office and acted herself to take large amounts of cash from a single source, break it into amounts of less than $10,000, and engage in transactions at different banks and in the name of different payees in order to hide from the different banks the fact that it came from a single source and the identity of the source. Nadal's purchase of the two $5,000 cashier's checks, made out to Perlmutter, from Republic National Bank on two consecutive days must logically have been done at the direction of Perlmutter.

Similarly, it is only logical that Perlmutter either purchased herself or sent someone like Muraskin to Union Federal Savings to get the $5,000 in $500 money orders, and to Emigrant to get the tellers' checks. Muraskin's writing is on the only available check requisition form, for $5,000, from Emigrant. Only a customer of the bank, which Manson was not, could obtain a tellers' check. If Perlmutter herself was at the bank with Muraskin, standing in a different line, she clearly had the requisite intent to break the $12,000 they walked in with into amounts that would not trigger the CTR reporting requirement. Even if Perlmutter was not with Muraskin, the inference that she explicitly or implicitly directed him to split the transaction is compelling. For even if Muraskin acted without Perlmutter's knowledge in connection

with the March, 1981 Washington transaction, it strains belief that he did so again here. Perlmutter certainly knew of the two $9,800 deposits in the Washington transaction immediately after the fact, since the next day she and Muraskin each filled out a $200 deposit slip and each wrote a $10,000 check for the Washington closing. It is a logical inference that she knew why it was done, since she was told that day by McLoughlin that a CTR had been filed, and since Nadal testified to overhearing the conversation about CTR's. Even if she gave $12,000 to Muraskin in October, 1982 with the innocent instruction of "Get some checks," she must have known and, given all the circumstances, must have intended that he would split the transaction.

There is no direct evidence of why Perlmutter concealed the fact that some transactions were in actuality a single transaction and did not conceal the fact that the $120,000 deposit went for a single purpose, or why she broke down the amounts of the instruments used for the purchase of the Riverdale co-op and yet wrote "purchase of co-op, 3240 Riverdale" on each of them. Neither is there an explanation of why Perlmutter caused a bank to fail to file a CTR on at least one occasion and did not cause banks to fail to file a CTR on four other occasions.[9] Nevertheless, it is a wholly reasonable inference that she intentionally avoided CTR reporting requirements on the occasion of the Monsanto transaction by directing people in her office to engage in multiple transactions at multiple banks with multiple payees and no reasonable doubt can be entertained to the contrary.

These facts establish that Perlmutter acted willfully, under 18 U.S.C. § 2(b), in the sense that *Heyman* defines it—with knowledge of the CTR reporting requirements and with the intent to cause the bank to fail to file a CTR. At the time of these acts, however, *Heyman* was inchoate. Although the statute does not state

---

9. The fourth CTR was filed on October 26, 1981 and has not been shown to be related to the transactions at issue here.

that a private person's conduct in causing a bank to fail to file constitutes a criminal act, and even though the bank did not violate the law by virtue of the fact that it did not know that this was a single transaction, *Heyman* requires that this court find Perlmutter guilty of Counts Seven and Eight.

Therefore, because Perlmutter knowingly and intentionally caused Emigrant, by the device of splitting up a $12,000 transaction into amounts less than $10,000, to fail to file a CTR, Perlmutter is found guilty as charged on Counts Seven and Eight.

**Count Ten**

■ Unlike Counts One and Seven, which charge concealment of a material fact under 18 U.S.C. § 1001, Count Ten charges Perlmutter with making a false statement within the jurisdiction of a department or agency of the United States, specifically, the IRS, as prohibited by the same section. In the case of false representation, there is no requirement in the Second Circuit that the false statement be shown to be material. *See, e.g., United States v. Elkin*, 731 F.2d 1005, 1009 (2d Cir.), *cert. denied*, 469 U.S. 822, 105 S.Ct. 97, 83 L.Ed.2d 43 (1984).

To establish a violation of 18 U.S.C. § 1001, the government must prove that 1) the defendant made a false statement on or about May 9, 1984, 2) the statement was made with the knowledge that it was false, 3) the statement was made unlawfully, knowingly, and willfully, and 4) the statement was made in relation to a matter within the jurisdiction of a department or agency of the United States. *See* 1 L. Sand, J. Siffert, W. Loughlin, S. Reiss, Modern Federal Jury Instructions (Criminal) 36–25 (1985); *United States v. Silva*, 715 F.2d 43, 49 (2d Cir.1983) (citing *United States v. Adler*, 380 F.2d 917, 920 (2d Cir.), *cert. denied*, 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 804 (1962)). Section 1001 has been *McCue*, 301 F.2d 452, 454 (2d Cir.), *cert. denied*, 370 U.S. 939, 82 S.Ct. 1586, 8 L.Ed.2d 804 (1962). Section 1001 has been held to apply to false statements made during the course of an IRS interview. *See United States v. Morris*, 741 F.2d 188 (8th Cir.1984); *cf. United States v. McCue, supra*, 301 F.2d 452 (defendants convicted on basis of statements made under oath).

As to the element of falsity, the government must show "that the defendant either knew the statement was false ... or acted with a conscious purpose to avoid learning the truth." *United States v. West*, 666 F.2d 16, 19 (2d Cir.1981). Otherwise stated, the element is satisfied if the defendant knowingly and willfully "acted with ... disregard of whether the statements made were true or with a conscious effort to avoid learning the truth ... even though ... not specifically aware of the facts which would establish the falsity of the statements." *United States v. Sarrantos*, 455 F.2d 877, 881 (2d Cir.1972); *United States v. Egenberg*, 441 F.2d 441, 444 (2d Cir.), *cert. denied*, 404 U.S. 994, 92 S.Ct. 530, 30 L.Ed.2d 546 (1971); *United States v. Hanlon*, 548 F.2d 1096, 1101 (2d Cir. 1977). However, the defendant would not be guilty if the court finds that the defendant in fact believed the statements to be true. *See, e.g., United States v. Morales*, 577 F.2d 769, 773–74 (2d Cir.1978).

■ Special Agent Polvere, a credible witness, testified that Perlmutter stated to him on May 9, 1984 during the course of an IRS interview that she did not have the $120,000 check or her Merchants November 1981 bank statement, although she had already looked for them at the bank's request. The statement that she did not have the records was proved false in the summer of 1985 when Bernard Tobacman went to Perlmutter's files and pulled out the records in question.

There is reasonable doubt, however, both that a false statement was actually made and that Perlmutter knew it to be false. Although Polvere took notes immediately after the interview of what had transpired, he did not take notes contemporaneously with the interview. Therefore, the context of this statement is not fully recorded. Perlmutter may have meant that she did not have the statement and check available. Alternatively, since she also stated that the $120,000 had nothing to do with Washington and that she would not discuss her

dealings with clients, she may have meant that she would not give Polvere any documentation of her dealings with other clients.

Even if Perlmutter meant to state that she did not have the statement and check, there is reasonable doubt that she believed that representation to be false. The evidence did not show that Perlmutter knew where past records were. She did not personally file the bank statements and checks in the cardboard box in which they were kept. After she placed the most recent ones in her desk drawer, Tobacman or his daughter moved them from there to the box in the cabinet. In 1984, Perlmutter may not have known whether her 1981 records were merely hiding in one of her cabinets or lost. Neither Nadal nor anyone else testified as to Perlmutter's knowledge in this regard.

Finally, Perlmutter may have looked for the records in the right place and simply have overlooked them. Although one might surmise that she may have never looked for them, knowing that the bank had no records of this transaction, there is reasonable doubt that she knew her statement to be false when she told Polvere that she did not have the records.

Therefore, Perlmutter is found not guilty on Counts One, Two, and Ten, but guilty on Counts Seven and Eight.

IT IS SO ORDERED.